**Arthur MILLER, Plaintiff,**

v.

**SWISSRE HOLDING, INC., Defendant.**

**No. 87 Civ. 6766 (KC).**

United States District Court,
S.D. New York.

July 18, 1991.

---

Kathleen Sullivan, John Dalley, Legal Intern, Rafael Raffaelli, Legal Intern, BLS Legal Services, Brooklyn, N.Y., for plaintiff.

Adam Seiden, New York City, for defendant.

## ORDER

CONBOY, District Judge:

Plaintiff Arthur Miller brings this action pursuant to 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, claiming that the defendant SwissRe Holding, Inc. ["SwissRe"] failed to promote him due to his race and discharged him in retaliation for filing a charge of discrimination with the Equal Employment Opportunity Commission ["EEOC"]. SwissRe denies any discriminatory or retaliatory conduct on its part, and contends that its personnel actions were the result of legitimate, non-discriminatory business decisions, and that plaintiff was not terminated but rather resigned or abandoned his position.

Plaintiff seeks a declaratory judgment that the defendant unlawfully discriminated against him; an injunction reinstating him with full seniority and to a level consistent with probable merit, raises and

promotions; an award of back pay and related employment benefits plus interest; an award of actual damages of $100,000.; an award of punitive damages of $500,000; an award of costs and attorney's fees; and any further relief deemed just by the Court.

Defendant seeks a declaratory judgment that it did not discriminate, and an award of costs and attorney's fees. We granted partial summary judgment to SwissRe on February 26, 1990, 731 F.Supp. 129.

The case was tried before the Court without a jury. This opinion shall constitute the Court's findings of fact and conclusions of law in the matter.

*Discrimination Claim*

■ Plaintiff, who is black, began his employment with SwissRe as a computer aide in its production control department in June, 1982. Tr. 27.[1] Ken Jacobson was the head of production control when Miller was hired. Tr. 28. Maryanne Bastiero was also hired in 1982 and assigned to the production control department. Tr. 38. Nina Ogrodnick was hired as a technical coordinator in the department in the spring of 1984. Tr. 409. Jacobson resigned in February, 1985. Tr. 32. The supervisor's position was not filled until October, 1985. Tr. 37, 39, 58. When Jacobson resigned, SwissRe "decided to look at the people that were currently on staff to bring them along as supervisors in the production control area, and [it] looked at two people, Nina Ogrodnick and Maryanne Bastiero." Tr. 412. Ogrodnick was considered because she had supervisory experience with her previous employer and "very strong skill sets of the MVS–JCL knowledge base [to which the department had recently converted]." Tr. 412. Bastiero was considered because "she had a good knowledge of all the application and processing flow of the organization." Tr. 413. Miller was not considered because he "was still in the process of learning a lot of the applications," and he had no supervisory experience. *Id.* Jacobson's duties were divided between Ogrodnick and Bastiero, for purposes of evaluating both. Tr. 414–15. In May, 1985 Bastiero came to Vincent Perito who was overall supervisor of the machine services department, which included production control, and his deputy Joseph Porco, who was overseeing Ogrodnick and Bastiero, and said that she should be given Jacobson's position because of her experience. When she was told that management was not yet ready to make its decision, she resigned. Tr. 414. Because only Ogrodnick remained as a candidate, Perito and Porco prepared a formal qualifications notice, or "Job Alert" for internal posting and external dissemination, and went to SwissRe's Human Resources Department to find additional candidates. Tr. 416–17. The Job Alert listed the position requirements as follows: three to five years experience as a supervisor or manager; three years of data processing experience in an operational unit, and a two-year computer science degree or equivalent college degree. DX K[2] Seven to ten outside candidates were produced as a result of the dissemination of the Job Alert. Tr. 419. Ultimately, Ogrodnick was selected and appointed to the position. Tr. 420. During this period of search, Miller was promoted twice, to the position of computer aide-senior in April, 1985 and to the position of production coordinator in September, 1985.

Miller testified that he was not interested in the position until Bastiero left in May, 1985, Tr. 183–184; that he knew of the vacancy, Tr. 52; that he had open door access to Perito, Tr. 182, and daily meetings with Porco, Tr. 41; that he knew of the job alert procedure utilized by SwissRe to fill vacant positions, Tr. 50; and that between Bastiero's departure in May, 1985 and the selection of Ogrodnick in October, 1985 he never told Perito, Porco or the personnel department that he wanted to be considered for the position of supervisor, Tr. 184–85. Miller also conceded that he lacked the three to five years of supervisory experience necessary to qualify for the position. Tr. 187–88.

---

**1.** "Tr ____" references the trial transcript.

**2.** "DX ____" references defendant's exhibits.

We find as an ultimate fact that Miller never applied for the position, and furthermore, that he lacked the supervisory experience that was an essential requirement for the position. We additionally find absolutely no evidence whatever that SwissRe discriminated against him based upon race. Furthermore, we find that Ogrodnick had superior qualifications for the position and received the position because of legitimate business reasons of SwissRe. Accordingly, plaintiff has failed to establish, under both section 1981 and Title VII, his claim that he was denied promotion based upon illegal racial discrimination, and judgment is given to SwissRe on these claims.

*Retaliation Claim*

Fourteen months after Ogrodnick was given the promotion, Miller told Porco on December 8, 1986 that he required surgery for a detached retina, and would need to take a disability leave as of December 16. Tr. 96, 515–21; DX T. Miller went to the SwissRe medical office and filled out medical forms which were sent by the company nurse to his personal physician, Dr. Unterricht. Tr. 97; DX L. On Miller's final day before going on medical leave, Porco handed him a note that warned him that his career at SwissRe was in jeopardy because of a truculent attitude toward Ogrodnick, a reduction in job productivity, and lateness, and that immediate improvement was essential. Tr. 99–100; DX I. Miller underwent eye surgery on December 17, 1986 and his doctor predicted that he would be able to return to work on February 2, 1987. PX 7.[3]

On February 2, 1987 Miller called Perito, advising that his eye was not yet well enough to resume his duties, and that he would remain on leave at least until his next doctor's visit in mid-February. Tr. 104–105; 478. Perito informed Miller that he should not return to work until he was 100% fully healed. Tr. 479; 434. When Miller visited Dr. Unterricht on February 10, the doctor told him that there was still blood in his surgically repaired eye. Tr. 126; 127; 204; 207.

Miller telephoned Perito a second time in mid-February, again to report on his medical progress. Perito again told Miller not to return until his eye was fully healed. Tr. 479–80. Perito never warned Miller that he needed to submit a supplemental disability form as a requisite to extending his leave. Tr. 479–481.

Miller did receive in the mail, PX 9, 10, a supplemental disability form and letter that warned him that "[failure to submit this form may cause a problem with your disability benefits]". However, Miller's benefit eligibility had already expired as of January 21st.

On February 20, 1987 Miller filed a complaint with the EEOC alleging a discriminatory denial of promotion and racial harassment in the workplace. PX 42, Tr. 131–132. He did this in anticipation of his return to work, specifically in response to the threatening letter he had received from Porco on his last day of work before his disability leave commenced, and what he understood to be the harassment that preceded it. Tr. 131–32. The EEOC intake officer advised Miller to visit SwissRe and attempt to settle his grievance, and to inform the defendant that he had filed an EEOC complaint. Tr. 132–33. Although his eye was still not well enough for him to return to work, Miller reported to SwissRe on the next work day, February 23rd, with the intention of meeting with his manager Perito, to discuss his difficulties in the production control department. Tr. 131; 133; 330; 484–85. While Miller was waiting to see Perito, he met briefly with Porco, his immediate manager. Porco was under the misapprehension that Miller had actually returned to work. He thus told Miller that he would have to produce for the medical department on the next day, February 24th, a note from his doctor authorizing his return to work. PX 27.

Miller then met with Perito in his office. Tr. 133; 138–43; 436–51. Miller told him that "there was still some sensitivity in [his] eye". Tr. 438; 483. Miller and Perito discussed plaintiff's complaints about the evaluation process at SwissRe, and his

---

3. "PX ___" references plaintiff's exhibits.

complaints about how he was being treated by management. Tr. 139–40, 438. Miller told Perito that if nothing could be done within the company to help him, he might have to go outside the organization to resolve his problems. tr. 446–47.

The next day, February 24th, Perito telephoned Ken Robinson, defendant's employee relations manager, and told him about the meeting with Miller. Tr. 448. Perito also told Robinson that he should expect Miller later that day, and that if nothing could be done within the company to help Miller, Miller had said that he might have to go outside the organization to resolve his problems. Tr. 450; 448. Perito knew when he spoke to Robinson that Miller was considering bringing a suit against SwissRe. Tr. 451.

The same day, Miller at Perito's direction went to speak with Robinson at SwissRe's personnel department. Tr. 143. Miller first met briefly with Peter Randlov, a personnel officer with whom he had previous contact, and informed him that he had filed an EEOC complaint. Tr. 143–44, 502–503. Randlov directed Miller to Robinson. Tr. 144. Miller informed Robinson of the problems he had experienced with his supervisors and of the EEOC complaint he had filed four days earlier. Tr. 390–91, 144. Part of Robinson's job as employee relations manager was to respond to complaints of employment discrimination. Tr. 384; 529. Robinson promised Miller a meeting between himself, Miller and a vice-president named Kevin Cronin to address Miller's complaint. Tr. 147; 145.

The following Tuesday, Porco terminated Miller's access to defendant's offices. PX 11.

On March 11, Mr. Miller visited Dr. Unterricht, who filled out a supplemental disability form stating that Miller could return to work the next week. Tr. 149–50. That same day, defendant received a copy of Miller's EEOC complaint by mail. PX 42. Also on that same day, Robinson sent Miller a letter informing him that his resignation would be accepted if a supplemental disability form was not received by SwissRe within five days. PX 12; Tr. 372.

Miller asserted at trial that he never received this letter. Tr. 148.

Camille Cooper, defendant's associate in-house counsel, received Miller's EEOC complaint on March 11, 1987. Tr. 396; 502. She telephoned Robinson immediately, and told him of receiving the EEOC complaint, and requested Miller's personnel files. Tr. 502. Robinson directed Cooper to Peter Randlov. Cooper was not told by Robinson that he met with Miller just days earlier, or that Miller had orally told him about the grievances that led to his EEOC complaint. Nor did Robinson mention anything about sending Miller a letter that same day warning him that his continued employment with defendant was in danger. Tr. 524; 529. After conversing with Robinson, Cooper telephoned Randlov and spoke to him at length about Miller. Tr. 503; 524. Randlov then provided Cooper with Mr. Miller's personnel file. *Id.* Cooper testified that a copy of Robinson's March 11 letter to Miller was already in Miller's personnel file when she obtained the file later that day. Tr. 534.

Six days later, on March 17th, Cooper wrote to the EEOC, responding to Miller's complaint. PX 41. In that letter, defendant asserted that it was SwissRe's normal policy to assume an employee resigned if he failed to submit a supplemental medical form, and that Miller would accordingly be removed from defendant's payroll. However, at trial Robinson described the company policy as being predicated on an assumption that the employee had another job, and he further conceded that the company had never had a situation comparable to Miller's. Tr. 380–81.

Two days after SwissRe's response to the EEOC, Miller on March 19, 1987 received at his home a telegram terminating his employment at SwissRe effective March 18, 1987. The telegram stated that "since we have not received your supplemental disability forms, we have accepted your resignation effective today, March 18, 1987." PX 13.

Miller did not seek comparable employment in the months after his discharge but instead attempted to launch a business of

his own, the publication of a local directory listing neighborhood retail establishments by category. He made up a contact list of prospective customers for the directory, which he then planned to publish and to distribute door to door. PX 32; Tr. 160–61. Miller's initial expected circulation was 10,-000 units, and predicted initial starting costs were between $8,000 and $10,000. The distribution area was to cover several neighborhoods in Brooklyn. Tr. 162. Miller worked on this project on a full-time basis and invested about $145. Tr. 249. The venture can only be described as a disaster, lacking capital, planning and energy. Indeed, we cannot find, based upon the record before us, that the effort was either a viable or serious one.

Miller began looking for work in the computer field in November, 1987. He consulted the New York Times and contacted several employment agencies. Tr. 165; DX G. He obtained interviews at this time both through agencies and New York Times advertisements. *Id;* Tr. 245–46. Miller made at least sixteen employment contacts in pursuit of a job starting in November, 1987 through February, 1988. DX G. Miller finally obtained his current position at the Securities Industry Automation Corporation (SIAC) as of February 10, 1988. DX E. Miller's initial regular salary at SIAC was $393 weekly. *Id.* As of August 12, 1989 Mr. Miller earned $438 weekly regular earnings at SIAC. DX F. There is no evidence in the record that reveals his earnings history at SIAC since that date.

*Discussion*

Under Title VII, it is unlawful for an employer to discriminate against an employee because he has made a charge or participated in any manner in an investigation, proceeding or hearing under Title VII. 42 U.S.C. § 2000e–3(a) (1988). Once a Title VII plaintiff makes out a prima facie case, the employer is required to articulate a legitimate, nondiscriminatory reason for the discharge. *See Dister v. Continental Group, Inc.,* 859 F.2d 1108, 1112 (2d Cir. 1988). Should defendant meet this burden, it then becomes plaintiff's ultimate burden

to persuade the court by a preponderance of the evidence that the employer's stated reason was a pretext, or that the presumptively valid reasons for the discharge were in fact a cover-up for a retaliatory discharge. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 805, 93 S.Ct. 1817, 1825–26, 36 L.Ed.2d 668 (1973); *Grant v. Bethlehem Steel Corp.,* 622 F.2d 43 (2d Cir.1980); *Ste. Marie v. Eastern R. Ass'n,* 650 F.2d 395, 399 (2d Cir.1981); *Geller v. Markham,* 635 F.2d 1027, 1032 (2d Cir. 1980), *cert. denied,* 451 U.S. 945, 101 S.Ct. 2028, 68 L.Ed.2d 332 (1981).

■ It is beyond dispute that Miller engaged in protected "participation" under Title VII by filing his EEOC complaint. Furthermore, defendant's telegram of March 18, 1987 terminating Miller's employment at SwissRe establishes the necessary adverse employment action under Title VII.

We find that SwissRe terminated Miller with full knowledge of his EEOC complaint. We find that Robinson knew about the complaint as early as February 24, 1987, and we reject his testimony to the contrary. Tr. 144 390–91. We reject entirely SwissRe's assertion that it was an innocent coincidence that the receipt of Miller's EEOC complaint at SwissRe and the dispatch of the letter to Miller warning of his termination in five days if certain disability forms were not received, both occurred on the same day, March 11, 1987.

We further find that the asserted basis for Miller's termination, that he had failed to file a disability extension form, was pretextual, designed to conceal the real reason for firing Miller, which was to punish him for filing his EEOC complaint. We note that SwissRe officials knew on March 11, 1987 that Miller's eye problem had been in large measure resolved, that submission of the absent forms was at best a mere formality, that Miller's disability benefits had expired on January 21, 1987, and that his return to work was imminent. We reject entirely any claim by SwissRe that its decision to fire Miller had nothing to do with the arrival of Miller's EEOC complaint at SwissRe's offices on March 11, 1987.

▮ The plaintiff having established liability for retaliatory discharge under Title VII, we now turn to the question of damages. At the end of his employment with SwissRe on March 18, 1987 Miller earned $24,856. As he did not begin looking for work in the computer field until November, 1987, Tr. 165, and thereby failed to mitigate his damages, we will calculate his back pay award only from that date. He obtained his present position with SIAC on February 10, 1988 at an annual salary of $20,436. We will, for purposes of comparison, omit any consideration of the $66 per week-night differential Miller has earned working the midnight to 8:00 A.M. shift. DX F. *See, Ford Motor Co. v. E.E.O.C.*, 458 U.S. 219, 102 S.Ct. 3057, 73 L.Ed.2d 721 (1982).

We accept plaintiff's method of calculating the salary he would have earned at SwissRe in each year since his termination by adding his average annual salary increases while he was employed at SwissRe, to his salary at the time he was terminated. PX 15, Tr. 43. This probable salary increase will include a calculation for an annual merit increase of 5.5%, which plaintiff, based upon his employment history at SwissRe, would have received regardless of promotions. Miller's salary increased a total of $11,856 during the 4.75 years he worked at SwissRe, i.e. from $13,000 in June, 1982 to $24,856 in March, 1987. His average annual salary increase was thus $2,496 ($11,856/4.75 years). PX 15. His earnings at SIAC will of course be deducted from his projected SwissRe income. As there was no mitigation of damages until November, 1987, Miller is entitled to have a back pay award from November, 1987 to August 12, 1989, the last date for income data of Miller at SIAC that is in the record. DX F. Because we have no data more recent than August 12, 1989, we cannot conclude that Miller has not achieved comparable compensation in his new position after that date. As plaintiff received unemployment insurance payments of $4,680.00, and in view of our conclusion that he did not actively seek employment until many months after his discharge, this amount will be deducted from his back pay award. *Grant v. Bethlehem Steel Corp.*, 622 F.2d 43 (2d Cir.1980); *Meschino v. ITT Corp.*, 661 F.Supp. 254 (S.D.N.Y.1987). The Court authorizes, as a discretionary matter, prejudgment interest on the back pay award in light of the fact that defendant's post trial papers are silent on the matter, and the usual course in this Circuit is to so authorize. *See*, on this question, in a Fair Labor Standards Act case, *E.E.O.C. v. County of Erie*, 751 F.2d 79 (2d Cir. 1984). The rate of interest shall be the annual federal short term rates from November 1987 through August, 1989 as set forth in the Internal Revenue Service guidelines for underpayment of taxes, 26 U.S.C. § 6621, compounding the interest annually. *Danna v. N.Y. Telephone Co.*, 755 F.Supp. 615, 617 (S.D.N.Y.1991); *Maturo v. National Graphics, Inc.*, 722 F.Supp. 916 (D.Conn.1989).

▮ Because defendant has put in no evidence indicating its inability to reinstate plaintiff, and there is nothing in the record suggesting that the employer-employee relationship is irreparably marred, SwissRe is hereby required to reinstate plaintiff to his former position, at a salary comparable to that which he would have achieved had he not been wrongfully terminated. The reinstatement salary level must reflect the incremental rates of increase he had received during his career at Swissre ($2,496 per year), plus merit increases of 5.5%, from the date of termination to the date of the judgment.

All other relief is denied. The plaintiff shall submit a proposed judgment on notice within ten (10) days of this Order.

SO ORDERED.