305 EAST 24TH OWNERS CORP., Anthony S. Niskanen, Sherry Kain, Jean Mullens, Ellen Fishman, Donald H. Layton and Mort Schwartz, Plaintiffs,

v.

PARMAN CO., Dicta Realty Associates, Jack Parker, Harold R. Liebman, Seymour Sadkin, Parman Corp., East 24th Garage Corp., East 24th Commercial Corp. and East 24th Laundry Corp., Defendants.

No. 85 Civ. 3788 (KMW)(SEG).

United States District Court, S.D. New York.

July 30, 1992.

354

Yvette Harmon, Ross & Hardies, New York City, for plaintiffs.

Robert A. Wolf, Robinson Silverman Pearce Aronsohn & Berman, New York City, for defendants.

## OPINION

GRUBIN, United States Magistrate Judge:

This opinion resolves what I hope is the final leg of a lengthy and bitter litigation between plaintiffs, a cooperative apartment building at 305 East 24th Street in Manhattan and its individual directors ("Owners Corp."), and defendants, the company and its affiliates and principals who owned the building and sponsored its conversion to a cooperative in 1984. The action involves certain long-term leases that had been entered into by plaintiffs with defendants at the time of conversion, which plaintiffs sought to invalidate pursuant to, *inter alia*, the Condominium and Cooperative Abuse Relief Act of 1980, 15 U.S.C. §§ 3601–3616 (1982) ("Abuse Act"). On cross-motions for summary judgment, the Honorable Robert J. Ward of this court found that plaintiffs were entitled to relief under the Abuse Act on the leases covering the garage and laundry premises in the building although not on leases covering

commercial management services. However, he found issues of material fact involved in additional claims made under the antitrust laws and under state law of unconscionability that required trial. Thereafter, the case was reassigned to the Honorable Kimba M. Wood who held a bench trial on the antitrust and unconscionability issues and rendered an opinion on May 30, 1989, finding in favor of defendants on both claims. That left the issue of what damages were to be awarded plaintiffs under the Abuse Act for defendants' having illegally refused to give up possession, control and income from the garage and laundry for the period October 9, 1985 (the date as of which Judge Ward found defendants' rights ceased) through October 31, 1987 (when defendants turned the premises over to plaintiffs). After briefing and oral argument by the parties as to the method by which plaintiffs' damages should be calculated, Judge Wood issued an order on September 18, 1990 referring the determination of the amounts of damages, prejudgment interest and attorneys' fees to a magistrate judge, and the matter was assigned to me. Thereafter, the parties conducted discovery and consented pursuant to 28 U.S.C. § 636(c) to have me render judgment in the case. Trial of the damages issues was held before me in December 1991 after which the parties submitted supplementary evidence and memoranda of law.

*Laundry*

The damages with respect to the laundry premises are not in dispute. The parties have stipulated that plaintiffs are to be awarded $2,545 for 1985, $10,622 for 1986 and $3,973 for 1987, for a total of $17,140.

*Garage*

■ Initially, we need to deal with the basis on which damages for the garage premises should be calculated because, although that issue was presented to Judge Wood, the parties disagree over the meaning of her disposition of it. Judge Wood's order of September 18, 1990 directed defendants ("Garage Corp.") to pay "plaintiffs' actual damages for Garage Corps.' refusal to give up possession, control, and profits from its lease for that time period, calculated on the basis of the lease's fair market value...." The dispute for purposes here arises because plaintiffs, once they took over the garage in November 1987, entered into a management agreement with a garage operator, Meyers Parking System, Inc., rather than a lease and contend that fair market value of the garage should be assessed on the basis of the garage's value under a management agreement. Defendants, however, contend that fair market value should be determined by the garage's value under a leasing arrangement and that Judge Wood decided the issue in that way. Both management agreements and leases are common forms of garage operation. Plaintiffs maintain that Judge Wood's use of the term "fair market value" is to be distinguished from "fair rental value" and that market value can be determined under a hypothetical management agreement as well as under a lease.[1]

Judge Wood chose "the lease's fair market value" after having been presented by the parties with the following three possible methods of calculating damages: (1) profits plaintiffs would have earned if they had been running the garage during the applicable period, (2) "fair rental value" of the garage, and (3) profits earned by defendants during the period, as reported on their tax returns. Having combed the record, I believe that defendants are correct in that Judge Wood's ruling reflects her intent to award damages on the basis of the garage's fair rental value under a lease; *i.e.*, she chose method 2. Plaintiffs' proposed method of valuation under a management agreement as set forth in the evidence of their expert, Gerald Prager, would, in essence, give them method 1's form of calculation which Judge Wood rejected in favor of method 2. What follows, therefore, is my evaluation of the evidence

---

**1.** Although plaintiffs' calculations as to damages from applying a management agreement and a lease arrive at what plaintiffs' counsel deems "fairly comparable" results—the management agreement valuation would give them slightly more—defendants' contention as to the fair market valuation under a lease is startlingly less than plaintiffs'.

and my valuation of the damages on the basis of the garage's fair rental value.

I found Mr. Prager a wholly credible witness. I also found Susan Goldberg of Meyers Parking very credible and frank. While Dennis Cunning, defendants' expert, was a largely credible witness (although attempting a bit too hard to please his client), I do not believe his conclusion as to fair market valuation of a lease, *i.e.*, that a garage operator during the relevant period would have paid rent in the nature of a 100% ratio to profit, was supported by sound evidence, nor was it one his relevant experience could allow him to draw. While his testimony is based largely on his knowledge of Meyers' business as a former employee, it is not clear that he has any idea whatsoever how Meyers arrived at rental figures it was willing to pay garage owners. He arrived at his 100% valuation ratio solely on the basis of the profits Meyers made during the period on four other residential garages which he deemed "comparable" to plaintiffs' garage solely because Ms. Goldberg described those four as garages in cooperative or condominium buildings, without regard to any other factors such as locations, age of the leases, etc. (Although there are also vague references to his knowledge of rentals and profits on Meyers' garages beyond these four, it is unsubstantiated.) [2]

I accept Ms. Goldberg's testimony as to what rent Meyers would have offered plaintiffs during the relevant period. It is supported by her substantial knowledge and experience in negotiating leases, by other credible evidence and by plain common sense. I also accept the Prager methodology underlying her conclusions of using Owners Corp.'s 1988 revenues and extrapolating them back to 1985, 1986 and 1987 and using Garage Corp.'s expenses for that period to arrive at fair market rent.[3] Defendants have, however, persuad-

**2.** My determination herein is expressed with less explanatory detail and in a somewhat more abbreviated fashion than I would like. I do it in this form because much of the relevant evidence has been given to the court under seal and would have to be revealed in a more exhaustive opinion. Indeed, the testimony of two of the three major witnesses at trial was stipulated to be confidential and has been filed under seal. While I do not condone this method of trial under seal, as the parties request it and, at least as of now, no third party has sought unsealing, I am content to allow it. The parties should be assured that, despite the lack of explanatory detail in portions of this opinion, it is rendered only after thorough review and rereview of the record and submissions. The only shorthand taken has been in the writing.

**3.** Defendants contend that their actual revenues as well as expenses for the period as reported on their tax returns should be used. However, to do so would essentially adopt method 3 which Judge Wood specifically rejected as the basis for calculation. Although defendants might contend that the judge did so because she was misled by plaintiffs' counsel as to the magnitude of difference between the revenues reported by defendants for 1987 and plaintiffs' revenues in 1988 (apparently plaintiffs' counsel misspoke before Judge Wood, citing the difference from 1986 revenues, not 1987 revenues), I do not find the misstatement at all material to the judge's subsequent conclusions in light of the entire record. Moreover, I am unpersuaded that the reasons proffered by defendants for the increase in reported revenues between their operation of the garage and plaintiffs', including the rate increases which they contend Mr. Prager inadequately applied, can account for the amount of that increase, an increase which I do find significant. Finally, defendants' figures, unlike plaintiffs', have no supporting documentation to allow any attempt at verification. (The testimony of garage attendant Ralph Rivera has little probative effect on the question of the accuracy of the reported figures.)

While it appears the rate increases may have accounted for some of the growth in revenues, from what I can tell Mr. Prager's analysis for the most part properly applied them, and any additional adjustment to the figures on this basis would be insignificant. I find the other factors to which defendants have pointed in explanation for greater revenues in 1988 to be the proverbial smoke screens on the scant real evidence presented. The scaffolding that was around the building continued to be there through 1988 and 1989. While defendants contend Owners Corp. would not allow them to place a parking sign on the scaffolding, the only evidence of that was hearsay testimony of the garage attendant and was persuasively rebutted by the testimony of the president of the building's board of directors. But most significant is the fact that, as I understand the evidence, the scaffolding did not extend to the garage section of the building, which juts out to the east side of the premises. Someone driving a car across 25th Street, which runs one-way from east to west, would come to the garage before the scaffolding, and Mr. Rivera's testimony that the scaffolding "made it hard to see the opening down into the garage" for one driving a car

ed me that certain adjustments to Mr. Prager's expense figures are in order, which will correspondingly decrease the Goldberg estimates.

Ms. Goldberg explained that the way in which she determined the amount of rent to offer a garage owner for a lease was to "back into it" by deducting the estimated expenses of running the garage from the estimated gross revenues the garage would take in. The resulting figure was termed by her the "remainderment." She would decide what rent to offer by applying a certain percentage generally sought by her for Meyers as a return on its rent investment (the percentage range is part of the evidence under seal), and the difference between the remainderment and that amount would be the rent she would offer. According to her testimony and the other credible evidence, the rent Meyers would have offered in 1985, 1986 and 1987, based upon the Prager revenue and expense figures, would yield damages (prior to crediting payments defendants have made, which will be deducted below) as follows: $29,133 for October 9–December 31, 1985;[4] $150,-000 for 1986; $143,750 for the ten months of 1987. However, I find adjustments should be made as follows.

Based on the testimony of Mort Schwartz, the president of the building's board of directors, if plaintiffs had had control of the garage during the relevant period, they would have staffed it on a 24–hour basis. Therefore, the cost of salary, benefits and payroll taxes for an additional employee should be added to expenses. I accept Mr. Cunning's figures on this, as shown on Schedule 4 to his report, rather than Mr. Prager's. Mr. Cunning claims his

are based on the union's applicable wage and benefit rates, an assertion plaintiffs have not challenged. Expenses should also be increased by 6% of the rent to reflect the City's use and occupancy tax which, because payable on commercial leases, was not included in Mr. Prager's analysis. I also find an allocation of $2,800 for signage appropriate as an initial one-time cost. Beyond the foregoing, I do not find any of the modifications proposed by either party warranted. Defendants are unpersuasive that costs for insurance and for maintenance and repairs would have been greater than their costs therefor, and plaintiffs are unpersuasive that there is any basis under the circumstances for reducing defendants' costs for office supplies or for maintenance and repairs as proposed in Exhibit 16.

Based on the foregoing, I have taken the "remainderments" shown by Mr. Prager's report and, as rounded off, presented to Ms. Goldberg at trial, and I have determined the percentage profit over rent that Ms. Goldberg's estimated rent represented. I then calculated the amounts of adjustments found warranted above, reduced the Prager remainderments by these adjustments and, using the new remainderments, determined those sums that represent the same percentages of profit as the Goldberg estimated rent for each year (involving a later round of calculations to account for the 6% tax), which, after deduction from the final remainderments, yield what I deem to be the best assessment of fair market value that can be made at this time. The results are as follows: 1985 (prorated): $23,107; 1986: $120,930; 1987 (prorated): $116,615. After deducting the rent actually paid by defendants and their stipulated 1987 payment, the final results, represent-

down 25th Street (Trial Transcript 366) is not credible. I do not find the chimney construction or storage of equipment in the garage of any note; indeed, in early 1988 the building undertook more major construction that had a greater impact on garage space. Mr. Rivera's testimony that he turned away customers perhaps one or two times because of it is not worth our time to consider. The unspecified references to construction two or three blocks away should be accorded no weight. There is no evidence as to when this construction was being done, when it ended or that, in fact, it diverted drivers from 25th Street. With respect to the

alleged "overparking" by Meyers, there is no credible evidence to support the contention that Meyers exceeded the specified capacity during 1988 or that Garage Corp. did not do so in the earlier period.

4. Although plaintiffs' post-trial contentions reference Ms. Goldberg's testimony to have been that she would have offered $125,000 to $150,-000 in 1985, the transcript shows her to have said $125,000 to $130,000. I have calculated on the basis of $127,500.

ing the amount defendants are to pay as garage damages, are as follows:

| | |
|---|---|
| 1985: | $ 15,235 |
| 1986: | 83,240 |
| 1987: | 39,645 |
| Total: | $138,120 |

I recognize that this assessment has been an inexact science as it, of course, must be by its very nature. To the extent that it is, the burden has weighed against the plaintiffs. Thus, under the foregoing determination defendants have obtained the following benefits, *inter alia:* First, the determination has been made on the basis of the rental value of a lease rather than on the value of a management agreement, despite that plaintiffs, had they been given the garage in October 1985, would have almost assuredly entered into a management agreement. Second, in the analysis applied defendants have received the benefit of the "management fee" included as a part of their expenses, amounting to approximately $8,000, $18,000 and $15,000 for 1985, 1986 and 1987, respectively. From what I can tell, this fee represents an accounting matter for tax savings and overhead and has little, if any, relevance to actual expense. The evidence is lacking, however, to make any definitive determination and, given that under the Prager analysis all of defendants' expenses have been applied as listed, I have decided any adjustment would be inappropriate at this point. Third, defendants have received the benefit of a straight 6% use and occupancy tax without credit for commercial parkers be-cause I do not find in the record the evidence to determine the amount that credit should be. Fourth, the analysis assumes a 10% rate of inflation on expenses from year to year, which is higher than the actual rate. Finally, the foundation of the determination—Ms. Goldberg's testimony as to the rent she would have offered given Mr. Prager's "remainderments"—could not be precise at this time. I suspect, given all the evidence, that the amounts she would have initially offered Owners Corp. may not have been the amounts at which she would have ultimately entered a lease with the building. Undoubtedly Mr. Schwartz would have done some negotiating, and as Ms. Goldberg put it, "you get what you can get." It is not unlikely, given her testimony, that she would have paid far more at that time to get Meyers' foot in the door with the expectation of making up any loss of profit in future years.

*Prejudgment Interest*

■ Judge Wood's order of September 18, 1990 directed that plaintiffs receive prejudgment interest on these laundry and garage damages because "plaintiff[s] should have all benefits that would have flowed from their being able to use the asset at that time, which benefits include the use of the money during that time." (Transcript of September 17, 1990, p. 19.) Plaintiffs are hereby awarded prejudgment interest, based on the annual rates adopted pursuant to 26 U.S.C. § 6621 for underpayment of taxes and compounded annually:[5]

| On the sum of: | From | Prejudgment Interest |
|---|---|---|
| $17,780 | 12/31/85 | $ 15,845.94 |
| 93,862 | 12/31/86 | 68,251.21 |
| 43,618 | 12/31/87 | 25,338.13 |
| Total | | $109,435.28 |

See, e.g., *Miller v. Swissre Holding, Inc.,* 771 F.Supp. 56, 62 (S.D.N.Y.1991); *Danna v. New York Telephone Co.,* 755 F.Supp. 615, 617–18 and n. 3 (S.D.N.Y.1991); *Diduck v. Kaszycki & Sons Contractors, Inc.,* 774 F.Supp. 802, 814–15 (S.D.N.Y.

5. The annual rates are: 9.5% in 1986; 9.25% in 1987; 10.5% in 1988; 11.5% in 1989; 11% in 1990; 10.25% in 1991; and 8.33% in 1992. Interest has been calculated through July 31, 1992. For each day thereafter until judgment is entered, $60.24 per day will accrue.

1991).[6]

*Attorneys' Fees*

Pursuant to the discretion granted in § 3611(d) of the Abuse Act, Judge Wood's September 18, 1990 order also awarded plaintiffs reasonable attorneys' fees incurred in pursuit of their claims on the garage and laundry premises. Plaintiffs' attorneys have submitted contemporaneous time records and presented testimony concerning the work performed on this case since 1985. The evidence shows that through March 1992 plaintiffs paid $231,-427.16 in fees and disbursements in connection with the claims on the garage, laundry and commercial leases.[7]

■ Defendants do not challenge the qualifications of plaintiffs' counsel, nor do they challenge the reasonableness of the hourly rates applied. They do, however, challenge various other aspects of the fee application. First, they contend that the amount should be reduced by at least one-third because plaintiffs, while prevailing on their claims concerning the garage and laundry leases, were unsuccessful with respect to the commercial lease. Plaintiffs' counsel, however, has explained under oath that no separate or additional work was performed with respect to the commercial lease (but for the writing of a one-paragraph description of that lease's terms included in the summary judgment brief). This assertion would appear to be supported by the circumstances of the case. Defendants do not explain in what way, if any, that assertion may be belied, and, indeed, they are willing to assume *"arguendo* the truth of that allegation." (De-

fendants' Post–Trial Memorandum of Law, p. 16.) They argue, nevertheless, that *Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), and its progeny direct a reduction in fees in these circumstances. I disagree. Plaintiffs are entitled to the fees incurred in pursuit of their garage and laundry claims. Whether the work performed on those claims was also referable to any other claims, successful or unsuccessful, is irrelevant. The evidence appears undisputed that, had there been no commercial lease, the time spent on the other two would have been the same time presented here. The issue here is simple: how much time was reasonably expended in pursuit of the garage and laundry claims. *Hensley* and its progeny are inapposite. The task in those cases was to determine how much work should reasonably be considered as having been expended on unsuccessful claims which did not contribute to the success of the fee applicant on other claims, so that the fee applicant would receive reimbursement of only those amounts deemed incurred in pursuit of the claims on which it prevailed. Here, we know how much work was expended in pursuit of the garage and laundry claims. There is no further analysis that needs to be done on that score.[8] Defendants' second contention as to why the fees should be reduced, that plaintiffs' success was a result of the holding in a 1987 decision of the Second Circuit in another case and not of counsel's efforts, I find devoid of merit and requiring no discussion. Defendants have submitted no authority to support their novel proposition.

---

6. Defendants' contention that the amount of interest should be reduced because from November 1990 through June 1991 plaintiffs inordinately delayed the action by failing to provide, for possible settlement purposes, documentary evidence and proposed calculations is rejected. This court does not find plaintiffs caused inordinate delay in the light of the context of this case and the materials provided. Nor can this court determine on this record that the "delay" was not caused in part by the defendants, as plaintiffs' counsel contends. In any event, defendants had the use of the money throughout, and the award of interest simply transfers what they gained to the plaintiffs who should have had it.

7. A 50% reduction in fees billed prior to the damages aspect of the case was applied to represent work on the antitrust and unconscionability claims. Defendants have not disputed the reasonableness of this approach.

8. Defendants' contention expressed in footnote 14 of their post-trial brief, that the fee request should be discounted by 64% because defendants' alleged income under the commercial lease represented that percentage of the income from the three leases combined, was rejected at trial and is rejected again. Defendants have submitted no authority to support such proposed method of assessment.

In addition to the foregoing amount of fees that were billed and paid, plaintiffs request an additional $21,832, representing time spent by Marilyn Y. Klein, whom the parties refer to as plaintiffs' "in-house counsel." Defendants contend this request should be denied in its entirety. The term "in-house counsel" is really a misnomer for Ms. Klein. She was a resident of the building who, as a lawyer, was asked by the building to look into matters before outside counsel came into the picture. Indeed, it apparently was Ms. Klein who first informed plaintiffs' board of directors of the existence of the Abuse Act and their rights under it and helped the board retain outside counsel. Thereafter, Ms. Klein was asked by the board to continue to work on the matter with outside counsel. Ms. Klein was not paid by plaintiffs for her services, but she kept records of her time. The board and Klein orally agreed that, if their claims were successful, a fee application for her time would be made to the court and, if granted, paid over to her.

▮ That plaintiffs are not "out-of-pocket" for Ms. Klein's fees or for her time (as in the usual case of real in-house counsel) is not determinative of the issue. While the legislative history is silent as to whether the purpose of the Abuse Act's attorneys' fees provision was compensation to successful plaintiffs or deterrence to sponsors who refuse to abide by the intended self-executing lease termination provisions, we can only assume it was both. The Second Circuit has recognized that the Act was enacted "to protect the rights of tenants" and that Congressional intent was "to alleviate developer abuses during the conversion process." *West 14th Street Commercial Corp. v. 5 West 14th Owners Corp.*, 815 F.2d 188, 190 (2d Cir.), *cert.*

*denied*, 484 U.S. 850, 871, 108 S.Ct. 151, 200, 98 L.Ed.2d 107, 151 (1987). *See also 2 Tudor City Place Associates v. 2 Tudor City Tenants Corp.*, 924 F.2d 1247, 1251 (2d Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 83, 116 L.Ed.2d 56 (1991). Apart from the deterrent function of an award, however, the testimony is undisputed that Ms. Klein worked very closely with outside counsel and with the board in performing functions that another lawyer would have had to perform in her absence, from the drafting and reviewing of papers to discussing and advising the board about the case. Moreover, Ms. Klein was not just some attorney who happened to live in the 386-apartment building. She received her law degree in 1958 and was valedictorian of both her law school and undergraduate classes. Currently she is the general counsel of a telecommunications corporation, and, at the time of her work on this case, was the Director of Litigation Management for a large multi-national corporation where she directed and participated in worldwide litigation. According to both her testimony and that of plaintiffs' outside counsel, her services on this case were not duplicative of any performed by other counsel and replaced work that outside counsel would have otherwise been compelled to do. Indeed, plaintiffs' chief outside attorney testified that if Ms. Klein had not been working on the case, it would have been necessary to have another very senior attorney, perhaps the head of litigation at the firm, perform that work. Under these circumstances, it is appropriate to assess defendants for her time (which has been reduced by 50% to exclude the antitrust and unconscionability claims), and none of the cases cited by defendants in their post-trial brief dictates a contrary result.[9]

---

**9.** In footnote 18 to their post-trial brief, defendants assert that their review of Ms. Klein's diary entries underlying the times set forth in Exhibit 13B reveals that "there are no underlying records for the months of June or November 1985, nor for several of the days which appear in the summaries for the months of July, August, September and October 1985." The court has not been provided with the underlying records, but insofar as plaintiffs have not disputed the assertion, I presume it is correct.

Exhibit 13B, however, shows a total of only 12.5 hours to have been charged by Ms. Klein for the months of June and November 1985, and the description of the work performed would appear to be corroborated by the events occurring at that time and the time records of outside counsel. With respect to "several of the days" in July, August, September and October to which defendants refer, without their informing the court what days those were or how much time was charged, the court has no way to

■ Defendants claim further that the fee request is excessive because the case was overstaffed and attorneys at outside counsel's firm duplicated one another's work. Apart from isolated references to entries in the time records to various attorneys' having reviewed, revised or edited papers, which entries in themselves are not particularly probative of defendants' assertion, defendants provide no basis for such a finding.[10] During oral argument at the close of trial, the court informed defendants' counsel that, instead of vague, conclusory argument, he should tell the court "how many of the hours that they are charging for, you believe are excessive." Defendants' counsel responded, "I will be happy to set that forth in our brief." (Tr. 843.) Defendants' post-trial brief, however, does not do so, and, hence, gives the court no basis whatsoever to make any reduction. Defendants, themselves, do not suggest in even conclusory terms what percentage they would propose the fees be reduced due to the alleged "overstaffing," simply requesting an unspecified "reduction." My own review of the time records reveals no warrant for reduction which, in the absence of countervailing evidence, will not be made. As I stated at trial, the number of attorneys who work on a case does not necessarily increase the number of hours spent or required to be spent on it. Defendants were afforded, and took, full opportunity for discovery on the attorneys' fees issue. Both substantively and procedurally, this case involved a number of novel and complex issues under a statute enacted in 1980 on which virtually no body of law existed. The number of hours for which fees are requested in the circumstances of this case appear wholly reasonable to this court.[11]

■ Plaintiffs, citing *Missouri v. Jenkins*, 491 U.S. 274, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989), and *Chambless v. Masters, Mates & Pilots Pension Plan*, 885 F.2d 1053 (2d Cir.1989), *cert. denied*, 496 U.S. 905, 110 S.Ct. 2587, 110 L.Ed.2d 268 (1990), request an upward adjustment of the amounts billed to reflect the delay in payment to the present. They seek an award based on the number of hours expended multiplied by their current hourly rates, rather than the actual rates billed and paid.

In *Missouri v. Jenkins*, the Supreme Court held, in the context of the provision of 42 U.S.C. § 1988 for awarding a reasonable attorneys' fee to the prevailing party, that "an appropriate adjustment for delay in payment—whether by the application of current rather than historic hourly rates or otherwise—is within the contemplation of the statute." 491 U.S. at 284, 109 S.Ct. at 2469. It is clear that such an adjustment for the passage of time is not limited to cases under the civil rights statutes, but is an appropriate consideration as well in other types of cases in which attorneys' fees are awarded. In *Chambless v. Masters, Mates & Pilots Pension Plan*, a case under ERISA, 29 U.S.C. § 1132(g), the Second Circuit, affirming in pertinent part the dis-

---

determine what reduction in Ms. Klein's request should be made on their account, even were the court inclined to make one. Despite defendants' hyperbole, these circumstances hardly evidence that "significant portions" of Ms. Klein's 93.80 hours are unsubstantiated or that they warrant a "substantial" reduction of her award. Under all the circumstances, I decline to attempt any reduction at this late point which would be, at best, in an insignificant amount. Although defendants did not receive the underlying records until after Ms. Klein's testimony at trial, it is only because they failed to ask for them until that time rather than during extensive discovery on these issues dating back over six months prior to trial. Thus, Ms. Klein was not even afforded the opportunity to explain the asserted deficiency at trial.

**10.** It is true that four attorneys were probably not necessary at the oral argument of the summary judgment motion before Judge Ward; but this one example of "overstaffing" is of miniscule materiality.

**11.** Moreover, this court was impressed with the determination and resourcefulness of defendants' counsel throughout this trial. Counsel's skill gained for defendants considerable advantage in the assessment of garage damages, but it also, of necessity, made for additional work on the part of plaintiffs' counsel. I assume the same tenacity of defendants and doggedness of counsel was expressed throughout the earlier course of the litigation; the number of hours expended by plaintiffs' counsel is, I am sure, some reflection of that as well.

trict court's rulings on attorneys' fees, stated:

> The district court expressly recognized its duty to consider this factor of delay. Although it denied plaintiff's request for interest, it employed hourly rates that were "sufficiently generous ... to ensure that plaintiff will be amply compensated for all delay." The above-quoted language from *Missouri v. Jenkins* suggests that district courts retain latitude in determining how they will compensate prevailing attorneys for delay.

885 F.2d at 1060 (internal quotation marks and citation omitted).

On the basis of *Missouri v. Jenkins,* Circuit Judge Winter, sitting by designation in *Cowan v. Prudential Insurance Co. of America,* 728 F.Supp. 87 (D.Conn. 1990), *rev'd on other grounds,* 935 F.2d 522 (2d Cir.1991), used current hourly rates to take delay into account in fixing fees in a civil rights case. *Id.* at 92. *Accord: Wilkinson v. Forst,* 729 F.Supp. 1416, 1418 (D.Conn.1990) (§ 1988); *King v. Board of Regents of University of Wisconsin System,* 748 F.Supp. 686, 690 (E.D.Wis.1990) (§ 1988); *Coston v. Plitt Theatres, Inc.,* 727 F.Supp. 385, 390–91 (N.D.Ill.1989) (ADEA, 29 U.S.C. §§ 216(b), 626(b)). *See also Huntington Branch NAACP v. Town of Huntington,* 961 F.2d 1048, 1049 (2d Cir.1992); *Tufaro v. Willie,* 756 F.Supp. 556, 563 (S.D.Fla.1991). Additionally, *see* numerous cases decided prior to *Missouri v. Jenkins, e.g., Ohio–Sealy Mattress Mfg. Co. v. Sealy, Inc.,* 776 F.2d 646, 651 n. 3 (7th Cir.1985); *Johnson v. University College of the University of Alabama in Birmingham,* 706 F.2d 1205, 1210 (11th Cir.), *cert. denied,* 464 U.S. 994, 104 S.Ct. 489, 78 L.Ed.2d 684 (1983); *Shakman v. Democratic Organization of Cook County,* 634 F.Supp. 895, 902–03 (N.D.Ill.1986), *mod. on other grounds,* No. 69 C 2145 (ACW), 1992 U.S.Dist.Lexis 5555, 1992 WL 80519 (N.D.Ill. Apr. 10, 1992); *In re "Agent Orange" Product Liability Litigation,* 611 F.Supp. 1296, 1309, 1314, 1327–28

(E.D.N.Y.1985), *aff'd in pertinent part,* 818 F.2d 226 (2d Cir.1987); *Virginia Academy of Clinical Psychologists v. Blue Shield of Virginia,* 543 F.Supp. 126, 144 (E.D.Va.1982), which hold that it is proper for the district court to take the factors of inflation and delay in payment into account in multi-year litigation, either by using current billing rates or by applying some other appropriate adjustment to historical rates.

There is no reason to deny plaintiffs here an upward adjustment to account for the passage of time, and defendants have not addressed the conceptual issue. It is quite appropriate in the context of the Abuse Act, its purposes and the circumstances of this case. The plaintiffs are simply individuals who live in the apartment building who have been paying legal fees directly to counsel.[12] Counsel informed us at trial that new assessments against these tenant-shareholders would most likely have to be made to pay for the December trial.

I do not believe, however, that the adjustment should be made by reference to counsel's current billing rates, but rather by a method which, to my mind, more accurately reflects the loss of the use of the money paid. In most of the cases cited above, given the nature of the causes of action and the statutes involved, the attorneys for whom fees were awarded had, presumably, not yet been paid. Indeed, the attorneys' fees provision of 42 U.S.C. § 1988 was in large measure enacted so that civil rights plaintiffs would be able to obtain the services of attorneys who otherwise would not be paid. Also in such cases, the fees for a plaintiff's attorney are contingent upon the attorney's winning the case, or some part of it, for his or her clients. At the conclusion of a case in which such a prevailing party seeks payment for its attorney, the court, in determining the appropriate amount, generally attempts to compensate fairly an attorney who has worked without payment. In the instant case, actual fees were billed and

---

**12.** From 1985 through 1987, counsel fees were paid by an insurance company with which the building maintained a policy. Insurance coverage ceased, however, and the subsequent fees

were paid directly to counsel by plaintiffs themselves. The insurance company is no less entitled to the value of its money than are plaintiffs, as has already been ruled in this case.

paid on a regular basis throughout the litigation. We do not have to guess what plaintiffs' attorneys would have billed in the past. We know precisely what it was and we find it to have been reasonable, and it is that amount, paid by plaintiffs, by which plaintiffs are out-of-pocket. While, on the basis of the reasoning in the various cases as cited above, it would not be inappropriate to award plaintiffs fees as calculated on the basis of counsel's current billing rates, in the context of this case it is more logical to me and is a more accurate way of accomplishing what the court seeks to achieve to start with the amounts actually paid at the times they were paid and then add an amount to reflect where plaintiffs would have stood today had they not lost the use of that money at those times. Therefore, plaintiffs are hereby awarded attorneys' fees and disbursements which shall include an adjustment to be calculated from the dates they were paid on the basis of the 26 U.S.C. § 6621 rates (see note 5, *supra*) and compounded annually.[13]

## CONCLUSION

The parties shall submit a *jointly*-proposed judgment for signature in accordance with the foregoing on or before August 12, 1992. If there is *any* dispute with respect to the form of judgment or the methods to be used in calculating the amounts therein, the court is to be notified by telephone conference prior to that date.[14]

---

13. No adjustment shall be made for Ms. Klein's fee, which has not yet been paid and which shall be limited to $21,832.

14. Plaintiffs' request for an award of Mr. Prager's fees is denied for essentially the reasons set forth in defendants' letter of April 23, 1992.